Summary judgment should be reversed and this case should be remanded for trial. Before we get into the specifics of that, though, it's important to keep in mind two things that are undisputed in this case, which are really a framework for understanding what was before the district court and what's before the court in this case. It's undisputed in this case that Manuel Roman suffered a head injury that resulted in a compensable claim. There was an on-the-job injury and it resulted in a compensable claim. It's also undisputed that it took more than five months for him to receive his benefits under the workers' compensation policy. The evidence in the summary judgment record – Is that unusual? I was trying to see what the usual timeframes are because the argument is that the delays were unreasonable. So I was trying to understand what in the record shows us what are reasonable timeframes for the various steps in the process. Well, there's a statutory deadline for the initial determination, compensability determination, to be made of 21 days. So there's 21 days after which you're deemed to be required to pay. Right. Right. And that's only if the person misses seven days of work. So it actually wasn't applicable by its terms in this case, but the insurance company may not have known that. It's unclear. But I guess the point is that that gives us an idea of what is reasonable. In fact, we had an expert in this case who issued her report, her opinion, about the reasonability. And it was that opinion that Berkshire should have had a compensability determination by the end of November and certainly by December 6th. And so in this instance, we have this initial delay. We have the initial part of the statutory period. Do we have any evidence that that initial delay, the eight days of opening the file, was unusual? Because it seems like if Berkshire had had an easier time contacting people, the eight days wouldn't have made a difference. They still could have gotten an answer maybe in 21 days. It just didn't end up playing out that way. Well, I think in terms of whether it was unusual, I don't have an answer to that question, Your Honor. But what I can tell you is that when we see what Berkshire's policy was, which was to issue investigative delays. Okay. Well, that is disputed. So let me just ask, going back to Judge Friedland's question about the unusualness. I mean, one of the things that stood out to me was that Mr. Roman said, I don't want to talk to you when he was originally contacted. I want you to talk to my attorney. So it seemed like there were various steps along the way where the insurance company was prevented from moving as quickly as it wanted. What do we do about that, about Mr. Roman's refusal, initial refusal to talk? We let the jury sort that out, Your Honor. The reasonableness of the insurer's conduct is a question that's normally reserved to the jury. And we did not move for summary judgment. We're not standing here saying that the facts on the summary judgment record would entitle us to summary judgment. Well, we're looking at whether there's a genuine issue of material fact as to whether the insurance company was unreasonable because the district court said as a matter of law it was not. So we're trying to understand what it is in this record, which on its face is not that communicative, that would say it was unreasonable or there's a genuine issue of material fact that what the insurance company did was unreasonable. Well, the insurance company had an obligation to make an initial determination and to do it within the timeframe. There are disputes about whether my client participated or his conduct can be attributed to him, but I don't think that creates. Okay, I didn't see that in the record. So at the time when it did issue a denial on, I guess that was December 6th, I mean, the information it had was that the shipper said he never, or the employer said he never reported an injury and no longer worked for them. They had information that it wasn't necessarily consistent with a traumatic injury. So they had some very, and they didn't have information from Mr. Roman, so they had some very ambiguous information. So was it unreasonable at that point, given the statutory deadline requirement to make the decision? So at that point they had a, they hadn't done what it would have been reasonable for them to do, which would have been to contact the ICA for medical records, to contact Mr. Roman directly. Is that in the record? Because the ICA sent them some very limited information. Is that a requirement to have contacted the ICA? It's something that a reasonable insurer would do. Is that in the record, that a reasonable insurer would do that? Yeah, it's in the expert report of Yvette Herndon, I believe. Where is that in the record? I'm going to find that. Your Honor, I apologize. I don't have that citation handy, and I apologize. I can supplement the court matter with that. Okay, well, we can find it. But I guess the point is that they could have done things that would have advanced this. Also, this is sort of a common trope that we see in these cases. Is there reason to think that the ICA had more information than it had given? Because it had sent along part of the claim, including an incorrect contact information address. So I'm just wondering whether Berkshire should have assumed that the ICA had more detail that would have been accurate. It would have given them additional leads so that they could have followed up and gotten more information. Do we know that? I mean, do we know that the ICA usually, in this industry, keeps some information and sends only part of the information? No, I'm not suggesting that, Your Honor. What I'm suggesting is that the information, if they had contacted the ICA for his medical records and for his information, it could have moved the process along more quickly. I guess what I'm asking is we know that in retrospect, but is there any reason Berkshire would have known that? Is there any reason they would have known that the ICA hadn't sent them everything it had? Berkshire, just their experience in the industry. But that's what I'm wondering. Is there anything in the record that tells us? I don't have anything I can point you to in the record, Your Honor. But what I do want to point out is that when you have this initial denial in order to investigate and get more evidence of the denial, you're also denying Mr. Roman medical benefits during this time. And the insurance companies like to say, well, our only option was to deny and then look for evidence. Did he have ongoing treatment that was not covered at that point? I thought he was already returned to work. He was returned to work, but there hadn't been any kind of investigation. He had asked to go to a doctor, and they had denied it. In fact, Dr. Epstein in the record says that that decision to deny him the ability to go to a doctor was unconscionable. Was he denied? I guess I didn't see that in the record. What exactly are you referring to? Because at that point they were following up with the medical providers, Wheaton and Arrowhead, but I didn't see anything in the record indicating denial of ongoing treatment. No, Mr. Roman requested to go see a doctor and he was denied. When was that? All right, let me find that in the record. Roman's request to see a doctor was denied on December 6th. Should I apologize, Your Honor? It was his request, but unfortunately my note does not have the record citation with it. I do believe we have the record citation in our brief. Okay. Of where that specific request was made and denied. But I guess the point is, Your Honor, that when you have a company that is engaged in this process, it's not giving equal treatment to its insured. And we also know this because once Berkshire actually goes ahead and receives the Wheaton records on December, on late December, December 21st, and this is in, this is ER 29 statement of fact 42, what the adjuster says is, hey, we've got these records, it helps our case, which again shows that at this point they're no longer investigating whether he actually has medical claims. They're looking to find reasons to support their denial, which is consistent with their denial protocol. Can I ask you a question about the denial itself? So the form says two different things. It says denied and then it says need more information, and there's going to be a continuing investigation. Did your client ever even receive that, if we call it a denial? Because I couldn't figure out from the record whether it went to him at all or whether it just went to the ICA. I believe he has notice of it, but I couldn't tell you that, Your Honor, off the top of my head. Because it seems like part of your claim, if I understand it correctly, is that he has emotional distress from the intervening time between when it was denied and when it was eventually granted. But if he never knew it was denied, I don't quite understand how that holds together. Well, and you'll find that on the excerpt of records 30. Our statement of facts 52 through 60 talk about his emotional distress, about the denial of his claim, and it's also implicit in there that he had requested medical treatment and had been denied it. So I apologize, Your Honor. I would love to give you that pinpoint citation, but I didn't realize that our record wasn't as clear in the briefing as evidently was. I'm unclear about something. Maybe you can help me. If the IC, if the commission, the industrial commission was contacted, what information would have been gleaned at that time that the IC had? I'm just not clear from the record what the industrial commission had. They have a notice of it. They have a notice of it. They have a notice of claim? Yeah, they have a notice of his injury and what he's claiming, and at that point he was claiming that he had had trauma. And they have whatever medical records were sent to them by providers at that point. What medical records were sent to them by providers at that point? I don't think there were any at that time. Because Wheaton and Arrowhead. They didn't provide them. Yeah, they were dragging their heels. Correct. Okay. Do you want to state that? I see that I only have three minutes left. Thank you, Your Honor. All right. Randy? Good morning, Your Honors, and may it please the Court. Andrew Jacobs for the appellee Berkshire Hathaway. Berkshire Hathaway Home State Insurance Company, which I'll call BIC to distinguish it from its corporate parent, here with my partner Sheila Carmody. The very last thing that counsel said, I would like to kind of keep the conversation going at that point. I think it's very telling that he says that I don't think there were any records that had been provided at that point. In fact, the plaintiff did not gather his own medical records, as was clear in the record below. On December 16th, his own counsel was saying, Berkshire Hathaway Homeland Insurance Company, I will get you the records after I have them. So no one had undertaken to get them yet. So it would have been impossible to make a reasoned coverage determination by the time of December 6th. That just wasn't something that could reasonably occur. And as to counsel's opening remark, he says, well, there was a five-month delay from the time of the inception of injury until benefits were provided. But, of course, we break down that period. Ten weeks of that was Mr. Roman not reporting it and was the, at least, Shippers West, as was alluded to before that. Sotomayor But the industrial commission had that information, did it not? They had the bare assertion that an injury had occurred shorn of any medical record, shorn of any substantiation, which then required the insurer to substantiate it through proper investigation, which was our duty, which we did. There's a case of the Arizona Court of Appeals in 2018, Tapia v. The Industrial Commission. And I lifted from that case this language that the court held there was bad faith because, quote, even though the adjuster easily could have obtained the claim form from the industrial commission in which Tapia had articulated the nature and circumstances of her injury, the adjuster did not attempt to do so. Why is that not similar to our case? It's not similar to our case because the bare assertion of injury still allows investigation. The statutory structure, Your Honors, we're just discussing, entails a 21-day period to review information. We diligently sought to obtain and review information. Maybe sometimes there's no more. Let me ask you some additional questions. I want to get the time frames down clearly here because the record is all over the place, I think. Tell me this is correct, that there were eight business days between the notice of claim, which was November 14th, and the assignment to the claims examiner, which was November 25th. And that's not explained why there was that delay. Do you think that there's anything about that that we should be concerned about? Judge Block, I'd like to focus on that. First of all, if you assume that it was instantaneously transmitted on the 14th to our client, then it would have been seven business days. It was in fact U.S. mail. The date of receipt is not clear. It was probably three or four business days, assuming it arrived the following Monday, the 18th, because it was sent on Thursday the 14th. That gets you to Monday the 18th, I would think, normal assumption, two business days. So on the 22nd, our office handed it to the adjuster. On the 25th, the named claims examiner professional is looking at it. So I don't think four business days rings the bell for exceeding negligence. So if we have an expert opinion that says these delays are unreasonable, isn't that enough to create a genuine issue material fact? Judge Akuta, I don't think that it does for several reasons. First of all, because Judge Wake was entitled to think that four days, four business days or so is not unreasonable. But in fact, whereas we see here the documents necessary to sustain the claim took 10 days to obtain from the earlier providing treating entity, and then six weeks after six diligent follow-ups from our side to obtain that as well. We just couldn't have obtained the information, even if, you know, what would have been necessary is for the physicians who were involved with the treating to be obtainable through the kinds of information we only got on December 6th. We didn't even have the ability to contact the treaters until December 6th. If I may, let me move forward. I also have jotted down that there were 10 business days between the assignment of that claim on November 25th and contact with Roman, which was December 6th, and no attempt to obtain contact from the ICA. Is that correct or not? That's also not correct, Judge, because on the 25th, that's the Monday of Thanksgiving week. And there were attempts, I think, contacting the employer, which is the only way to get his direct information, is an attempt to contact Roman. There were four such attempts made. But in any event, it wasn't 10 business days. It was about six or seven business days, allowing for the Thanksgiving holiday. How about the fail to contact the ICA? The ICA had provided the only information it had, which was the claim form. There was no further information. So the idea that the judge had to contact the ICA. The ICA didn't even know about that because no contact was made whatsoever, correct? No further contact was made aside from receiving the information the ICA had. The ICA, as a matter of fact, had no such information, so it could not exceed negligence to fail to obtain information that did not exist, Judge. But did the ICA, had it sent everything? I thought there was something that it had that it hadn't sent. It had no medical records, which was what was necessary to determine the claim. And it's the medical records that are the crux of the but-for analysis of negligence or supra-negligence necessary to judge. In that regard, my next time question. There were 29 business days between the records request, which was on December 6th, and the follow-up call to Arrowhead, which was on January 3rd. So there doesn't seem to be any explanation as to why there was that lengthy period of time. The records request was pending with Arrowhead. There were six requests. I had thought they were distributed more normally across the six-week period, but Arrowhead was very consistent in indicating that it could not provide the records instantly when contacted. And, in fact, they waited from the time of Your Honor's indicated contact for further weeks, for further weeks, excuse me, before the records were supplied. So, again, where Arizona law says mere negligence is not actionable as bad faith, it has to be supra-negligent, it has to be worse than above negligence, where the information is not there and not obtainable. Yes, Your Honor? I guess the ultimate question that I'm wrestling with is that isn't this all for a jury to sort out these facts, these timelines, the explanations, the lack of explanations and what transpired during this interregnum? It just seems that that's a factual-based type of concern. And I would say, Judge Block, respectfully, no. There's no issue of fact here as to there being worse-than-negligent behavior. Because it's a combination of the summary judgment standard and the requirement that the behavior be worse-than-negligent, that it be sort of advertent mistreatment. But the jury can draw inferences from the evidence, I suspect. It just seems that this is just pregnant with jury issues. Well, Your Honor, I guess we think Judge Wake decided this correctly for a number of reasons as far as the delay in the investigation. I mean, there was no ability to talk to Roman. When Roman was spoken to, his employer said, you know, first, they didn't have the information for Roman. We couldn't even reach them through Shippers. Shippers puts us on hold for a half an hour, won't let us leave voicemails. We call four times. They won't even talk to us. It's really hard to see how that process and that time interval can be seen even as worse-than-negligent, Judge Block. And aside from that, when we finally get to Roman, as was pointed out in the colloquy with counsel prior, Mr. Roman says, I don't want to provide information further to you, you should talk to my lawyer. And that's not so unusual for people to say speak to my lawyer. Speak to your lawyer is great in America, but their burden is to show supra-negligent behavior. And so I'm putting those two things together. That's the standard, supra-negligent behavior? It is supra, above-negligent behavior, because the bad faith law in Arizona, looking at Zillish, is that mere negligence in dealing with a claim cannot rise to the level of bad faith and can't be an issue under Rule 56, therefore. So it has to be worse than negligence. If the record indicates a reasonable prior effect could find negligence but not something that is bad faith, it is significantly above negligence. I don't see a supra-negligent standard, but would you measure bad faith? Is there a case that says that? Zillish says that mere negligence is not actionable as bad faith. Now, I understand. But supra-negligence, you said supra-negligent. I am saying supra, meaning above-negligent, is required by Zillish. I'm sorry, Your Honor. I'm speaking perhaps colloquially. So in Tapia, where they did find that there was bad faith, I believe, why was that? Maybe you could tell us why that was different than this case. The information in this case that was necessary to reach the coverage determination was not obtainable. And fair debatability within Arizona law, Judge Ikuda, indicates that it's reasonable to ask for the IME. Fair debatability insulates from a bad faith claim the actions of the insurer. When you don't have information sufficient and the information that was alluded to in prior colloquy, there was equivocal information even when obtained. If ordering the IME was fairly debatable, then not even having the information necessary to know that sort of cannot possibly be worse than negligent, because we needed to have the information needed to determine whether the injury is work-related, whether it truly was concussive, what the conflict between the different treaters was as far as is it traumatic. They said it's not traumatic. And the other one that seems to indicate it is traumatic. There's all this equivocation. And it cannot be worse than negligent in the absence of that information to not then grant coverage. And, in fact, we subsequently investigate grant coverage and pay $200,000 in benefits to the gentleman. So this is not a case of an insurer that's trying to shoehorn a denial into the record. And I think it's significant to know that ultimately coverage was had. The gentleman was paid. Coverage was determined upon the receipt of that necessary and vital information. That's what insurers are supposed to do. That's why we have the very procedure the gentleman indicated to put us to our paces to investigate and then to cover we're warranted, which we did. So opposing counsel says the statute says 21 days. So by law, it's contemplated that the insurer would have enough information in 21 days to deny or allow the claim to go forward. And in 21 days, Berkshire Hathaway had very incomplete information. So is that unreasonable as a matter of law? Berkshire Hathaway's conduct, BHHIC's conduct could not be unreasonable as a matter of law, Judge Ikuda, because we could not even get in contact with the employer, made four different attempts over the week and a half, could not get in contact with Roman. Roman would not provide the information. It can't be the law under this statute that even an injured person, by basically hiding from being found and not providing information, never having gathered medical records, though he had counsel, a topic in prior argument, all of that having happened, it can't be that we are at fault for simply saying, we have to hit a pause today to get more information so we can then eventually cover you, which is what we did. Did you ever argue that he was stopped from making this delay argument because he didn't answer the questions on the phone? We did not argue it as a matter of estoppel, Judge Friedland, but rather as a matter of fairness, that we think that we are proud of the fact that we diligently investigate. We understand there are difficulties here. This is a record, as I believe was discussed in prior colloquy, that tends to reflect a lot of barriers that were interposed. And, you know, we don't blame the gentleman for waiting 10 days to report 10 weeks, but he waited 10 weeks to report. We don't blame him for being out of touch with shippers, but he was out of touch. Why does that all count against us? That part goes too far for us. I'm still confused about this, and maybe you can straighten my confusion out. There are 29 business days between the records request, which was December 6th, and the follow-up call to Arrowhead on January 3rd. Am I unclear about that? Is there anything I don't understand about that? December 6th to January 3rd. It's a large 29 days before they contacted Arrowhead. I think December 6th to January 3rd is 28 calendar days, and with the holiday it's probably about 19 or 20 business days. It is the period it is, Judge Block. We agree. It is what? It is the period that you described, Judge Block. So why shouldn't a jury wrestle with whether or not that was a reasonable period of time before they followed up with the call to Arrowhead and got the medical records? Respectfully to the premise of the question, Judge Block, we're already past December 6th, and December 6th is the 21-day period which we've been discussing in short strokes what about. So at this point the question is if we actually need the information to decide about the IME, are we reasonably viewed as worse than negligent because they didn't give us stuff for four weeks? And that's just how medical records obtaining works in the culture. It took us four more weeks to get it with nagging them six times, Judge Block. I'm not clear, though, whether there's an explanation that satisfies me as a matter of law that that period of time was reasonable. So when they called Arrowhead, I guess, they continued to say it's two and a half weeks behind responding to record requests. So is that typical? You were saying that's part of the culture? It's an unfortunate part of the culture, which I as a consumer aside from insurance issues have whole separate issues with. And when medical records cannot be obtained within two and a half weeks, we do not say to the party seeking to obtain them that they could possibly be viewed as per se worse than negligent, especially in the Christmas season, especially when you're not within a 21-day statutory period. That's just really taking too long to ensure. There's something else here that troubles me a little bit. There's something in the record that talks about the fact that when the records were obtained, there's some reference that this could help our case out now. And could a jury not really consider whether that was reasonable, whether there was a sort of a effort by the insurance carrier to try to really challenge and contest all of this information, that they had sort of a game plan to do that? It may not be the case, but why would that not be for the jury to wrestle with? I appreciate that, Judge Block. And I think the issues of timing are the first cluster of issues. I've tried to explain why we believe in terms of number of days, why that is not reasonably viewed as worse than negligent by a jury. At that point, then, you get to the part between, and Your Honor has been discussing that, the part after December 6th and toward the time of coverage. And again, their fair debatability is the idea in Arizona law. If there is an issue of fact as to the fair debatability as to whether we were trying to explore this, then we should have a trial. But there is not an issue of fact as to, quote, fair debatability, because with all the equivocation in the medical records we finally obtained, you can clearly see such discrepancies that reasonable minds would differ about the necessity, then, to cover. So is it a perfect record? Absolutely not, Judge Block, and I fully take the point of your many questions on that point. But Arizona law does not hold us to that standard. It holds us to negligence, and imperfection is not enough for them to have an issue of fact under Arizona law. If the panel has more questions, I'd be pleased to entertain them. Otherwise, we'd be pleased to rest. We appreciate your argument. Thank you. Thank you very much, Your Honors. Your Honors, in my remaining time, I'd like to point you to some parts of the record based on my initial argument. The Claims Handling Experts Report can be found at ER 31, that's Statement of Fact 62, and ER 73, which is where the exhibit to that particular paragraph is. So I had a lot of trouble figuring out. It looked like you were citing to your Statement of Facts, which was not undisputed, and I couldn't quite tell, then, what it was citing. So tracing through your citations to actual evidence is very difficult here. I take that note, Your Honor. I apologize. Can you point us to something in the actual record, the actual underlying evidence, rather than just a Statement of Facts? Because I think then there's this – I'm actually having a little bit of trouble getting my iPad here to get me the page you just said, but if I recall correctly, it then cites things, and it's like Exhibit 2, and things that are hard to figure out what they are. Right. So I just pointed you to where the exhibit for that, for our experts' opinion, is at ER 73. Okay. It is Exhibit A. I believe they're two separate Statement of Facts. Trial counsel did it that way. That's the way they did it. So ER 73 is Herndon's declaration, is that right? ER 73 is Herndon's expert report. Also, the testimony about the delay in treatment for the IME was unconscionable. That's from Dr. Epstein. That testimony is found at Exhibit 15 to our Statement of Facts, which is ER 112. And again, we had a question about the delay and whether or not it was unconscionable. And I also would point the Court to ER 116 for the ICA notice claim and all the medical records that were attached to that since that was the discussion at the outset. In closing, I think what was important that came out of this, and it was part of my original statement, which is this case is as much about summary judgment standards as it is about bad faith standards. And in this case, there is enough for a jury to conclude, a reasonable jury to conclude, that Berkshire acted in bad faith and this case should be remanded for a trial for that reason. You think there's also enough for the jury to decide whether punitive damages are appropriate? It doesn't seem as if they are. Oh, I do think that they are, Your Honor, and I think that based on the policy itself, which has language that says we're going to work to deny, to support our denials, and the record in this case where the adjuster said I've got evidence that will support our case and the adjuster's choice to hire an investigator when the fact of injury was no longer at issue and hire an attorney as soon as he got the Arrowhead report, which showed that there was a compensable claim here. Yet we have continued delay, which Dr. Epstein said was unconscionable. I think that's all enough for punitive damages. Thank you. All right. Thank you, both sides, for their argument. The case of Roman v. Berkshire Hathaway Homestead Insurance Company is submitted, and the Court will take a five-minute recess before our final case.
judges: Ikuta, Friedland, Block